IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:10-CR-75-FL-1

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| ELI STAFFORD, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to suppress (D.E. 21). Defendant's memorandum was incorporated into the motion. The government filed a response (D.E. 24) in opposition. The motion was referred to the undersigned for an evidentiary hearing and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 10 Feb. 2011 Docket Entry). For the reasons stated below, it will be recommended that defendant's motion be denied.

## **PROCEDURAL BACKGROUND**

On 9 September 2010, defendant was indicted (D.E. 1) on charges of: possession with the intent to distribute a quantity of cocaine base (*i.e.*, crack), a quantity of marijuana, and a quantity of 3,4-methylenedioxymethamphetamine (*i.e.*, ecstasy) in violation of 21 U.S.C. § 841(a)(1) (ct. 1); use, carrying, or possession of a firearm, a .25 caliber pistol, during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (ct. 2); and possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924 (ct. 3). The alleged offense date for all charges is 9 May 2010.

On 21 January 2011, defendant filed the instant motion to suppress. The suppression motion seeks suppression of all evidence taken during and derivative from a search of the vehicle he was

driving on the alleged offense date that led to the charges against defendant, including the statements he made to police after his arrest.

On 2 March 2011, an evidentiary hearing on defendant's motion was conducted before the undersigned. (D.E. 28). At the hearing, the government presented the testimony of two local police officers, Corporal Tony Whitaker ("Whitaker") and Officer Michael Trevathan ("Trevathan"), who were involved in the events in question. (Transcript of Hearing ("Tr.") (D.E. 29) 3:12 to 4:1; 28:2-17). Defendant presented no evidence. Counsel declined the opportunity to file supplemental memoranda after the transcript became available.

## FINDINGS OF FACT

After careful consideration of all the evidence of record on defendant's motion, the court makes the following findings of fact:

### I. THE TRAFFIC STOP

Between 9:00 a.m. and 10:00 a.m. on Sunday, 9 May 2010, Whitaker, a corporal with the Tarboro Police Department, was conducting a random patrol in Tarboro, North Carolina when he was passed by a white sports utility vehicle ("SUV") headed in the opposite direction. (Tr. 3:12 to 4:1; 4:13 to 5:16). Whitaker noticed that the windows of the SUV were tinted and that the tinting appeared to be darker than that allowed by North Carolina law.[1] (Tr. 5:16-23). As a result, Whitaker turned his patrol car around, activated his lights, and conducted a stop of the SUV. (Tr. 5:24 to 6:5). When Whitaker approached the driver's side of the vehicle, the defendant, who was in the driver's

---

[1] N.C. Gen. Stat. § 20-127(d)(2) provides that "[a] person who does any of the following commits a misdemeanor of the class set in G.S. 20-176: . . . (2) Drives on a highway or a public vehicular area a vehicle that has a window that does not meet the window tinting restrictions set in this section."
2

Case 4:10-cr-00075-FL   Document 32   Filed 04/22/11   Page 2 of 16

seat, rolled down his window. (Tr. 6:8-9). After Whitaker explained to defendant why he had been stopped, defendant admitted that he had previously been stopped because of the window tinting and given warnings about it. (Tr. 6:9-15). Defendant was not able to provide Whitaker with any form of identification, but he told the officer his name was Eugene Daniels. (Tr. 6:19 to 7:13). Whitaker was unable to verify the identity of defendant at any time during the stop through the North Carolina Division of Motor Vehicles ("DMV") system because it was temporarily unavailable, as it often is on Sunday mornings. (Tr. 10:24 to 11:10; 19:7-23; 26:4-9).

During the stop, Whitaker noted that defendant first appeared calm but then became increasingly nervous and began avoiding eye contact. (Tr. 7:14 to 8:1). Because of defendant's nervous behavior and the need to investigate defendant's identity, Whitaker asked defendant if he would come back to the patrol vehicle, and defendant agreed to do so voluntarily. (Tr. 8:2-16; 21:9-24; 22:13-22).

Whitaker then radioed for a tint specialist to come and measure the tint of the SUV's windows. (Tr. 8:19-21). Officer Bennett ("Bennett") responded, arriving within a couple of minutes with a light meter.[2] (Tr. 10:1-9). Upon measurement, he found the window tint to be in violation. (Tr. 10:7-11). After the tinting was measured, Whitaker spoke with defendant again and noticed that defendant's behavior was more suspicious and nervous, his hands were sweating heavily and appeared "watery," his breathing was faster, and he still would not make eye contact. (Tr. 8:19-21; 15:4-12; 16:1-9). Whitaker then asked defendant if he had anything illegal in the vehicle, and

---

[2] Whitaker testified that he radioed Officers Nook and Connolly, but also that he called Bennett. (Tr. 8:19-21; 10:1-6). He did not identify the communications with the various officers as separate calls or suggest that they were separated in time. The court infers that the communication with Bennett was part of or immediately followed the communication with the other two officers.

3

defendant stated that he did not. (Tr. 9:16-18). Whitaker asked defendant if he would consent to a search of the vehicle, and defendant stated that he could not consent to a search because the vehicle was not his. (Tr. 9:18-20).

## II. THE CANINE SNIFF

Because of defendant's suspicious behavior, Whitaker next called Trevathan, an officer with the Tarboro Police Department, to conduct a canine sniff of the SUV. (Tr. 10:12-16;11-24 to 12:1; 22:23 to 23:9). Trevathan arrived at the scene within two minutes. (Tr. 10:18-23).

Trevathan arrived at the location of the traffic stop with the narcotics detection dog "Tazer," a German Shepherd, with whom Trevathan had worked for a little over three years. (Tr. 29:6-13, 34:12-14). After Whitaker briefed Trevathan on the situation, Trevathan brought Tazer to the driver's side of the SUV and gave him the command to search for narcotics. (Tr. 31:17-20). Tazer started at the front driver's side bumper and proceeded around the exterior of the vehicle in a counterclockwise direction. (Tr. 31:21 to 32:1). Tazer alerted for the presence of drugs at the driver's side door by heavy sniffing around the seams of the door, climbing up on the door, and increased body movement and heavy sniffing inside the open window. (Tr. 32:2 to 33:5; 38:11-16; 41:7-14). Trevathan then pulled Tazer down from the door and had him search the remainder of the vehicle's exterior. (Tr. 32:2 to 33:5). Tazer gave a second alert at the front passenger side door. (Tr. 33:23 to 34:9). Trevathan notified Whitaker that Tazer's alert indicated the presence of narcotics in the vehicle. (Tr. 34:20-24).

## III. THE SEARCH OF THE SUV AND DEFENDANT

Trevathan then opened the rear passenger door and allowed Tazer to begin a search of the interior of the vehicle. (Tr. 34:24-25). No search warrant was obtained prior to the search. (Tr.

4

24:8-10). Tazer started in the back passenger trunk area of the SUV and worked his way to the front of the vehicle. (Tr. 35:11-14). As Tazer approached the front passenger area, he began exhibiting behavior consistent with his detection of narcotics, including a "head snap" indicating that he had detected the odor of narcotics and fast body movements as he worked the scent trail. (Tr. 35:11-22). Tazer then put his head under the driver's seat and retrieved a clear plastic bag that appeared to contain marijuana, crack, and pills. (Tr. 12:25 to 13:9; 35:19-23; 36:16 to 37:1). A .25 caliber handgun, two cellular phones, and two digital scales were also found under the driver's seat. (Tr. 13:10-16; 13:22 to 14:5; 15:18-22; 43:24 to 44:3). Trevathan was on the scene with Tazer for approximately 10 minutes, which includes the time for the initial briefing with Whitaker and 2 to 3 minutes for the exterior sniff. (Tr. 37:21 to 38:7).

Based on the results of the search, defendant was placed under arrest. (Tr. 24: 11-14). A search of defendant's person recovered $705.00 in cash. (Tr. 13:17-22). Defendant was transported to the Tarboro Police Department. (Tr. 14:7-15; *see also id.* 18:6-11). The entire encounter starting with the traffic stop and ending with defendant's arrest lasted approximately 15 to 20 minutes. (Tr. 16:10-20).

## IV. DEFENDANT'S STATEMENTS

After arriving with defendant at the police department, Whitaker advised defendant of his *Miranda* rights, and defendant admitted that his named was Eli Stafford, not Eugene Daniels. (Tr. 14:16-24). Defendant also stated that he had several outstanding warrants, which Whitaker was able to confirm. (Tr. 14:15 to 15:3).

Also after the stop, Whitaker spoke with the owner of the SUV. (Tr. 26:13-17). She indicated that she knew defendant by the same alias of Eugene Daniels defendant had given Whitaker. (Tr. 26:13-15).

## DISCUSSION

As indicated, defendant seeks suppression of all evidence obtained as a result of the search of the interior of the SUV and his person on 9 May 2010, including his statements to police following his arrest. Defendant's principal challenges to the search are that (1) a warrant was required because the main justification for the search was a canine sniff and (2) the canine did not, in fact, alert to the presence of drugs in the SUV.[3] The government denies both these contentions and argues that the search of the SUV was valid as incident to the traffic stop of the vehicle. The court will examine the principal contentions of the parties in turn below.

### I. DEFENDANT'S CONTENTION THAT WARRANT WAS REQUIRED BECAUSE OF RELIANCE ON CANINE SNIFF

Defendant's principal argument is that the alleged positive alert by Tazer did not obviate the need for a warrant to search the interior of the SUV, but at best provided simply part of the basis for an application for a warrant. This is the only contention he advanced in oral argument at the hearing, having also asserted it in his motion. He relies on the Ninth Circuit's decision in *United States. v. Lingenfelter*, 997 F.2d 637 (9th Cir. 1993). There, the court upheld a warrant for the search of a warehouse where probable cause for the search was established largely by a canine sniff. *Id.* at 39. The court stated that "[a] canine sniff alone can supply the probable cause necessary for issuing a

---

[3] Defendant also argues that he did not act suspiciously prior to the canine sniff, as the government contends. He does not, however, explain the alleged legal significance of this contention. The court will address this contention by defendant in its analysis of the government's theory of the case in section III below.

search warrant if the application for the warrant establishes the dog's reliability." *Id.* Defendant appears to rely on this case for the proposition that a warrant is required where probable cause for a search rests substantially on a canine sniff.

Defendant's contention that a warrant was required due to reliance on the canine sniff is directly refuted by established Supreme Court and Fourth Circuit precedent. The automobile exception to the search warrant requirement under the Fourth Amendment provides that where there is probable cause to search a vehicle "'a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.'" *Maryland v. Dyson,* 527 U.S. 465, 467 (1999) (quoting *United States v. Ross,* 456 U.S. 798, 809 (1982)); *see also Pennsylvania v. Labron,* 518 U.S. 938, 940 (1996) (per curiam) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more."). It is also "well settled that a positive alert from a drug detection dog, in and of itself, provides probable cause to search a vehicle." *United States v. Branch,* 537 F.3d 328, 340 n.2 (2008) (internal quotation marks omitted) (citing *United States v. Jeffus,* 22 F.3d 554, 557 (4th Cir.1994)). Thus, a warrant was not required for the search of the SUV by virtue of its being substantially based on a canine sniff.

As the case law cited makes clear, defendant's reliance on *Lingenfelter* is misplaced, in part, because it is factually inapposite. It involved a warehouse, not a vehicle and thereby the automobile exception to the warrant requirement, as here.

Moreover, *Lingenfelter* does not stand for the proposition that a warrant is required where probable cause for a search is based largely on a canine sniff. Indeed, it did not even address the need for a warrant to search the interior of the warehouse at issue because a warrant had been issued.

7

Its concern was the sufficiency of the warrant. For this and the other reasons discussed, defendant's initial challenge to the search of the SUV fails.

## II. DEFENDANT'S CONTENTION THAT THE CANINE FAILED TO ALERT

As indicated, defendant also contends that Tazer's behavior did not constitute an alert for the presence of narcotics. Specifically, in his motion defendant states that the "canine did not alert, but simply jumped up on the driver's door and without barking which was less than an alert." (Def.'s Mot. 7). Without a true alert, defendant reasons, the police did not have an adequate basis[4] to search the interior of the SUV.

Contrary to defendant's contention, the record establishes that Tazer did alert for narcotics during the exterior sniff of the SUV. As discussed, he exhibited heavy sniffing around the seams of both the front driver's side and front passenger side doors, climbing on the doors, increased body movement, and heavy sniffing inside the open windows. (Tr. 32:2 to 33:5; 33:23 to 34:9; 38:11-16; 41:7-14). At the front passenger door, Tazer also barked and actually attempted to jump into the window before Trevathan pulled him down to prevent damage to the vehicle. (Tr. 34:3-9; 42:2-4). Trevathan testified that this conduct by Tazer constituted an alert to narcotics inside the SUV. (Tr. 32:24-33:5; 33:12-14; 33:23-34:9; 38:11-16; 42:21-43:9).

The record further demonstrates Trevathan's competence to render this opinion. He testified that he has worked with Tazer for more than three years. (Tr. 45:4-8). He explained that each dog has its own individual way of alerting, but that, generally, a dog alerts through a body movement or other behavior that it would not normally exhibit. (Tr. 44:9-13). Recognizing an alert

---

[4] Defendant characterizes the absence of a true alert as depriving police of reasonable suspicion to search the interior of the SUV. As already mentioned, probable cause, not reasonable suspicion, was required for the search.

8

of a particular dog requires knowledge of that dog. (Tr. 44:21-24). He explained that Tazer is an "aggressive alert dog," that alerts via a variety of behaviors, often starting with increased body movement, tail wagging, and whole body movement, that is followed by scratching, biting, barking, jumping up, or other behavior that might indicate that the dog is attempting to get closer to the narcotics he has detected. (Tr. 32:19-23; 42:2 to 43:9; 44:13-17). Trevathan noted that an alert can be any one or a combination of these behaviors. (Tr. 32:20-23; 42:2 to 43:9; 44:17). The behavior Tazer demonstrated during the sniff of the SUV is consistent with this description of the manner in which Tazer alerts.

The record also addresses Tazer's reliability. Trevathan testified that Tazer had been accurate in the past. (Tr. 45:7-8).

Defendant offered no evidence contradicting the testimony showing that Tazer alerted. Defendant also did not directly challenge Trevathan's credibility. The court finds that he was credible. *See United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008) ("[I]t is the role of the district court to observe witnesses and weigh their credibility during a pre-trial motion to suppress."). Trevathan answered the questions put to him forthrightly and without evasion, and he gave every indication of recounting facts as he recalled them, not advocating for one side or the other.

For this and the other reasons discussed, defendant's challenge to the sufficiency of the alert by Tazer fails. The alert was adequate to establish probable cause for the search of the SUV under the authorities previously reviewed. The second main challenge by defendant to the search, like the first, is accordingly meritless.

9

## III. GOVERNMENT'S CONTENTION THAT SEARCH WAS VALID AS INCIDENT TO THE TRAFFIC STOP

As indicated, the government contends that the search of the interior of the SUV should be upheld as incident to the traffic stop of the SUV. The court agrees.

The relevant principles regarding traffic stops are well established. The detention of individuals during the stop of an automobile by police constitutes a seizure under the Fourth Amendment and therefore must not be unreasonable under the circumstances. *Branch*, 537 F.3d at 335. Police observation of a traffic violation provides sufficient justification to detain the offending vehicle for as long as necessary to perform the traditional incidents of a routine traffic stop—namely, to issue the driver a citation and determine that he is entitled to operate the vehicle. *Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Branch*, 537 F.3d at 335, 337. "Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver "must be allowed to proceed on his way." *Branch*, 537 F.3d at 336 (quoting *United States v. Rusher*, 966 F.2d 868, 876 (4th Cir.1992)). A canine sniff of the exterior of a vehicle is constitutionally permissible if performed within the period reasonably required to complete these tasks. *Caballes*, 543 U.S. at 407, 410; *Branch*, 537 F.3d at 335. No additional justification for a sniff is required because it is not a search within the meaning of the Fourth Amendment. *Caballes*, 543 U.S. at 408-09; *Branch*, 537 F.3d at 335-36.

To extend a traffic stop beyond this period, the officer must have a justification for doing so other than the initial traffic violation that resulted in the stop. *Branch*, 537 F.3d at 336. The justification may be the driver's consent or reasonable suspicion of a crime. *Id.* at 336, 337. The reasonable suspicion standard, which is less demanding than the probable cause standard, is satisfied

10

by the police pointing to "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 336 (internal quotation marks and citations omitted). In determining the existence of reasonable suspicion, the court's analysis must be "commensensical, focused on the evidence as a whole, and cognizant of both context and the particular experience of officers charged with the ongoing tasks of law enforcement." *Id.*

In this case, defendant does not dispute, and the court finds, that Whitaker's observation of the window tinting on the SUV gave him sufficient justification to stop the vehicle. The issue thus becomes whether the time taken extended beyond the period required to issue the tinting citation and determine whether defendant was entitled to operate the SUV. If the stop did last longer than this period, the question is then whether the prolongation was justified by reasonable suspicion of a crime. Although, as indicated, consent can also justify prolongation of a stop, there is no evidence that defendant gave any such consent.

There is substantial evidence that the stop did not extend beyond the period necessary to issue a citation for the tinting. Some time was required to determine whether the tint was, in fact, in violation. Thus, within five minutes of making the stop, Whitaker radioed for a taint specialist and the responding officer, Bennett, arrived within a couple of minutes after Whitaker called him. (Tr. 8:22 to 9:7; 10:1-6). It presumably took Bennett several minutes to test the tint and report the result to Whitaker.

A tint violation having been established, there was a need to prepare a citation for it. Needless to say, the citation needed to be in the name of the person who committed the violation. According to Whitaker, it is not sufficient to take a driver's word as to his identity because drivers

11

often provide false names. (Tr. 16:24 to 17:8). Verification of defendant's identity was also arguably necessary to determine whether he was entitled to operate the SUV.

Defendant's lack of any identification and his provision of a false name prolonged the process of establishing who he was. As Whitaker testified, when the driver has no identification, verification of identity, and consequently the stop, will take more time. (Tr. 17:9-11). Rather than being able simply to check a driver's license or other identification document for defendant, Whitaker was in the position of having to question him regarding his identity. The questioning began about five minutes into the traffic stop and appeared to continue for the remainder of it. (*See* Tr. 26:11-13). Nevertheless, the questioning did not succeed in establishing defendant's true identity, which defendant did not provide until after his arrest and transport to the police department. (Tr. 14:16-24; 26:10-13).

To be sure, the unavailability of the DMV system contributed to the difficulty of identifying defendant. But the courts have recognized that where, as here, the driver obstructs the police officer's efforts by providing inaccurate information or by any other means the resulting prolongation of the traffic stop is permissible. *See Branch*, 537 F.3d at 336 ("Of course, if the driver obstructs the police officer's efforts in any way—for example, by providing inaccurate information—a longer traffic stop would not be unreasonable."). It may be that under the circumstances presented the full 15 to 20 minutes that defendant was detained are justifiable by the routine functions attendant to the traffic stop. *See, e.g., United States v. Mason*, 628 F.3d 123, 132 (4th Cir. 2010) (holding that an 11-minute traffic stop in which the driver *provided a driver's license and registration papers* to the officer was constitutional where it included "brief questioning, the examination of papers, the calling

12

Case 4:10-cr-00075-FL   Document 32   Filed 04/22/11   Page 12 of 16

of his dispatcher to relate information, the testing of the tinted windows, and the issuance of a warning ticket").

The court need not make a definitive determination on that issue, however, because the record clearly establishes that Whitaker had reasonable suspicion of criminal conduct justifying any prolongation of the stop that occurred beyond the time required for the routine purposes of issuing a citation and determining the driver's entitlement to operate the vehicle. *See Branch*, 537 F.3d at 338 (finding no need to find entire traffic stop justified by the ordinary attendant inquiries to a stop where reasonable suspicion existed for further investigation). The reasonable suspicion arose, in part, from defendant's suspicious behavior during the stop. As noted, he became increasingly nervous and displayed sweaty hands and the evasive behavior of avoiding eye contact. *See, e.g., Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion"); *see also United States v. Scott*, 250 Fed. Appx. 534, 536 (4th Cir. 2007) (holding that an officer conducting a traffic stop had reasonable suspicion that the driver was armed based, in part, upon the officer's observations that the driver was "sweating, and looking straight ahead without making eye contact"); *United States v. Smith*, No. 2:10-CR-66, 2010 WL 3743840, at *3 (S.D. W. Va. 2010) (holding that "sweating and averted eyes" were relevant factors to consider in determining whether an officer had reasonable suspicion). Defendant's failure to provide proof of his identification also provided a basis for reasonable suspicion that criminal activity was afoot. The reasonable suspicion justified any additional minutes that may have been needed beyond the period required for the tinting violation to investigate possible criminal activity that was afoot and specifically to permit the exterior sniff by a drug detection canine.

13

The time total time of 15 to 20 minutes taken for the stop, including the dog sniff, is reasonable and thereby constitutional under the standards of *Branch*, arguably the leading Fourth Circuit case in this area. It involved a traffic stop for running a red light in which the driver provided false information about the location of the owner of the car. The police conducted an exterior canine sniff of the car resulting in a search of the car's interior that located drugs and drug paraphernalia. The total time for the stop was 30 minutes, up to twice as along as the stop here. The court determined this period of detention to be constitutionally permissible. *Branch*, 537 F.3d at 339.

Defendant disputes Whitaker's testimony that he was acting suspiciously during the stop of the SUV prior to the search. He contends, for example, that he did not appear nervous or display suspicious movements. He appears to concede that his hands were sweaty, but argues that this circumstance was caused by the hyperhidrosis (*i.e.*, excessive sweating)[5] from which he suffers, not nervousness.

Defendant's contentions are unconvincing. As indicated, he presented no evidence at the hearing, including no evidence on the suspiciousness of his conduct during the stop. In particular, his claim that he has hyperhidrosis is unsubstantiated. Whether or not it was substantiated at the hearing, it was objectively reasonable for Whitaker during the stop to attribute the sweating to defendant's being nervous, particularly since there is no evidence that defendant mentioned his alleged condition to Whitaker. (*See* Tr. 24:1-6 (Whitaker disclaiming knowledge that defendant had a condition causing his palms to sweat)).

The court finds the testimony by Whitaker that defendant was acting suspiciously to be credible. *See United States v. Abu Ali*, 528 F.3d 210, 232 (holding that the determination of

---

[5] *See* Definition of "Hyperhidrosis," Merriam-Webster.com, http://www.merriam-webster.com/dictionary/hyperhidrosis. (last visited 22 April 2011).

14

credibility rests with the trial court). As with Trevathan, Whitaker answered the questions put to him in a straightforward manner, without evasion or apparent advocacy for either side. Further, Whitaker's testimony that he observed defendant's hands sweating is corroborated by the representation in defendant's motion and in his counsel's questioning at the hearing that he has a medical condition that causes excessive sweating. (*See* Def.'s Mot. 4; Tr. 24:1-6). In addition, Whitaker testified that, based on his 12 years of experience conducting traffic stops, defendant's nervous behavior was not what he typically observes in other drivers during a stop. (Tr. 23:10-19).

Accordingly, the court concludes that the time taken for the stop of the SUV was reasonable. The time taken was necessary to perform the routine functions of the stop—to investigate and prepare the citation of defendant for the tinting violation and to determine whether he was entitled to drive the SUV—and, to the extent these functions did not consume the entire stop, to conduct further investigation based on the reasonable suspicion of ongoing criminal activity, including in particular the dog sniff that produced probable cause to believe drugs were in the SUV. The search of the interior of the SUV was therefore incident to the traffic stop and did not require a warrant. Defendant's motion to suppress should accordingly be denied.

## CONCLUSION

For the foregoing reasons, it is RECOMMENDED that defendant's motion to suppress (D.E. 21) be DENIED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and

15

Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 22nd day of April 2011.

James E. Gates
United States Magistrate Judge